IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | |
|---|---|
| MARK MILLARD, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. |
| ) | 14-4150-CV-C-REL-SSA |
| CAROLYN W. COLVIN, Acting ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Mark Millard seeks review of the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits under Title II of the Social Security Act ("the Act"). I find that the substantial evidence in the record as a whole does not support the ALJ's finding that plaintiff is not disabled. Therefore, plaintiff's motion for summary judgment will be granted, the decision of the Commissioner will be reversed, and this case will be remanded for an award of benefits.

*I.* **BACKGROUND**

On January 18, 2012, plaintiff applied for disability benefits alleging that he had been disabled since January 1, 2006. Plaintiff's disability stems from neck and shoulder pain and the residual effects of hypertension and diabetes including medication side effects. Plaintiff's application was denied on March 2, 2012. On April 4, 2013, a hearing was held before an Administrative Law Judge. On April 25, 2013, the ALJ found that plaintiff was not under a "disability" as defined in the Act. On April 9,

2014, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.     STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the

courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## *III.* *BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS*

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1. Is the claimant performing substantial gainful activity?

    Yes = not disabled.
    No = go to next step.

3

2. Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3. Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4. Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes = go to next step where burden shifts to Commissioner.

5. Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV. THE RECORD

The record consists of the testimony of plaintiff and vocational expert Denise Weaver, in addition to documentary evidence admitted at the hearing.

### A. SUMMARY OF TESTIMONY

During the April 4, 2013, hearing, plaintiff testified; and Denise Weaver, a vocational expert, testified at the request of the ALJ.

**1. Plaintiff's testimony.**

Plaintiff was 60 years of age at the time of the hearing and is currently 62 (Tr. at 27). Plaintiff stopped working on January 1, 2006, because he was having ulcers on his feet, problems with his hands, and difficulty hearing (Tr. at 27). He is just shy of 6 feet tall and weighs about 225 pounds (Tr. at 27). He is divorced and has two grown

4

children (Tr. at 27-28).  Plaintiff lives alone in an apartment, but his brother and nephew live in the adjacent apartment (Tr. at 28).  They help plaintiff out with transportation (Tr. at 28).

Plaintiff pays his rent with his pension funds (Tr. at 29).  He receives $1,143 per month (Tr. at 29).  Plaintiff has trouble with his eyes and his hearing (Tr. at 30).  He does not wearing a hearing aid -- everything he has done medically he has had to do when he could pay or when he could get some test or treatment for free (Tr. at 30).  Plaintiff applied for Medicaid but was told that his pension was too high for him to qualify (Tr. at 30-31).

Plaintiff has a high school education and was a certified emergency medical technician (Tr. at 31).  He has not done that for a while (Tr. at 31).  Until 2002 plaintiff was a plater operator at a wood and steel company (Tr. at 32).  He took early retirement in 2003 because a lot of jobs were being taken away, he had 30 years in, and he thought he could survive on his pension and healthcare (Tr. at 32).  His pension keeps getting reduced (Tr. at 29).  The company was in West Virginia, and after plaintiff retired he moved to Missouri (Tr. at 29, 33).  He was helping his brother out at the funeral home by mowing grass at Riverview Cemetery for a while, using a riding lawn mower (Tr. at 33, 73).

Plaintiff eventually lost most of his pension and his healthcare (Tr. at 35).  His son's father-in-law opened a lounge in his restaurant and offered plaintiff a position as a bartender (Tr. at 35).  He did this from 2008 through 2011 for two to three hours each day that he worked (Tr. at 35, 45).  Plaintiff sat on a barstool and watched television

5

until a server needed something (Tr. at 53, 58). The bar was in a family style restaurant and he only provided drinks to the servers to take to people's tables, he did not wait on customers (Tr. at 58). He had to ask them to repeat their orders so he could write it down due to his bad hearing and his memory issues (Tr. at 56). He was fortunate that a family member had given him a job so he could earn a little money (Tr. at 56-57). He was not doing any kind of full time work after he retired, because he has diabetes and was having a lot of trouble with his feet and hands hurting and going numb and problems with his shoulder and back (Tr. at 36). When plaintiff was still working in West Virginia, he was told he was borderline diabetic, and he cannot remember when he started taking medication for diabetes (Tr. at 38). He lost his healthcare and a lot of his pension so he could not take proper care of himself (Tr. at 38).

     He takes his medication as prescribed, but once he did not take it as directed because it was giving him vertigo and he passed out, ending up in the hospital (Tr. at 40). Now he takes his medication as prescribed, but it causes him to be dizzy and he gets blurred vision (Tr. at 41). It is hard for him to concentrate and remember to do things because of the dizziness (Tr. at 56). He talked to the doctor at a free clinic about this and was told to go to an eye doctor, but there is no free eye doctor in Jefferson City and he cannot afford to see one that charges (Tr. at 41). Plaintiff has no Medicaid, no Medicare, and no health insurance (Tr. at 39). Plaintiff has gone to the Mason Eye Clinic at the University of Missouri in Columbia where he received injections for macular thickening as a result of his diabetes (Tr. at 41-42). Plaintiff went to the Mason Eye Clinic after his last insured date (Tr. at 42-43).

6

Case 2:14-cv-04150-REL   Document 30   Filed 07/03/15   Page 6 of 17

During the hearing, the ALJ stopped plaintiff's counsel during this questioning and stated, "Here's my problem. It seems like the evidence that I have here that refers to the time period we're looking at with this date last insured being June of 2010, seems to be one, two, three and four.  And so, I need to be able to establish the limitations and the things before that date last insured.  If you want to try to focus in that area." (Tr. at 43).

In 2009 plaintiff went to the Capital Region Medical Center and was diagnosed with diabetes and hearing problems (Tr. at 44-45).  Plaintiff has a congenital heart murmur and in 2009 he was also diagnosed with borderline cardiomegaly (enlarged heart) (Tr. at 48).  He was having symptoms at that time and was having blackouts (Tr. at 48).  Plaintiff was having problems with his hands as well, dropping things due to numbness (Tr. at 51).  He was having pain and sores on his feet from infections (Tr. at 52-53).  Despite his foot pain, plaintiff tried to make himself walk because he was told he had to exercise because of his diabetes (Tr. at 55).

**2.      Vocational expert testimony.**

Vocational expert Denise Weaver testified at the request of the Administrative Law Judge.  If a person were off task around 20% of the time, he would be unemployable (Tr. at 70).

***B.     SUMMARY OF MEDICAL RECORDS***

Because the issue is whether plaintiff's impairments, prior to his last insured date, are substantiated by medical signs or laboratory findings, I have limited my

summary of the medical records to evidence that plaintiff's condition after his last insured date was a continuation of his condition prior to his last insured date.

On June 12, 2010, plaintiff went to the emergency department of Capitol City Regional Medical Center (Tr. at 256-299). He was noted to be a non-smoker and non-drinker (Tr. at 280). He was listed as being "self pay" status (Tr. at 296). Plaintiff's blood pressure was 210/114, and his blood sugar was high at 277 (Tr. at 261, 272, 285). He had been taken to the emergency room by his son because of vomiting and dizziness (Tr. at 279). Several hours after his arrival, he was still dizzy and very drowsy and had difficulty staying awake during the assessment (Tr. at 267). Plaintiff did not own a blood glucose meter (Tr. at 260-261, 274). Chest x-rays showed borderline cardiomegaly, an enlarged heart usually caused by high blood pressure (Tr. at 284). Plaintiff was given Glyburide (for diabetes), Propranolol (for high blood pressure), Zofran (for nausea), Metoclopramide (for vomiting), Meclizine (for dizziness), and Lorazepam (for anxiety) (Tr. at 275, 288). Eventually his symptoms subsided and his blood pressure was brought down closer to normal. On discharge, plaintiff was told to continue using Meclizine every three to four hours for vertigo (Tr. at 278, 283).

June 30, 2010, is plaintiff's last insured date.

On August 13, 2011, plaintiff was seen at St. Mary's Health Center for low heart rate, generalized weakness, dizziness, nausea and vomiting (Tr. at 300-305, 313-315). He was listed as "self pay" (Tr. at 300, 313). Plaintiff's blood sugar had been in the 200s and 300s (with normal being 100 or below). Plaintiff reported problems with his vision but said he had been diagnosed with cataracts and thought that was the cause of

8

Case 2:14-cv-04150-REL   Document 30   Filed 07/03/15   Page 8 of 17

his difficulties (Tr. at 314). He reported that his vision had been worsening over the past several years (Tr. at 314). Plaintiff reported having worked in a steel company all his life and retired from that work, but after the company went bankrupt he lost his health insurance and his benefits (Tr. at 314). Plaintiff was told that it was important for him to get under the care of a primary care physician (Tr. at 315). "Certainly will require further work up and care" (Tr. at 315). Plaintiff was assessed with hypertension, abnormally low heart rate, and diabetes (Tr. at 301).

On August 16, 2011, plaintiff saw Katherine Friedebach, M.D., to establish care (Tr. at 420-422, 533-535). He was assessed with uncontrolled hypertension and diabetes.

On August 21, 2011, plaintiff was admitted to St. Mary's Health Center (Tr. at 308-312, 321-348, 427-441, 539-540). While there he had a transthoracic echocardiogram due to a history of dizziness, fatigue, and heart murmur, complicated by hypertension and diabetes (Tr. at 306). Plaintiff was noted to have no insurance (Tr. at 308, 325). Plaintiff reported having been diagnosed with high blood pressure two years earlier after experiencing problems with dizziness and lethargy (Tr. at 308, 325). Plaintiff continued to experience dizziness during that time despite having been put on hypertension medication (Tr. at 308, 325). Prior to this hospital admission, plaintiff had tried to get up from a seated position, felt very dizzy and woozy, got down on the floor and could not get back up (Tr. at 308). He called relatives who arrived 30 minutes later and were able to get him to a chair (Tr. at 308). His blood pressure was 196/109 (Tr. at 308). His blood sugar was 180 (Tr. at 308).

9

"Hypertension for at least 2 years, diabetes mellitus for at least 2 years, but patient had no medical evaluation prior to that." (Tr. at 308, 325). Plaintiff reported having two cardiac catheterizations as a child (Tr. at 308, 311). Plaintiff had been taking Glyburide for diabetes, Lisinopril for hypertension, and Atenolol for hypertension (Tr. at 308, 311, 326). Plaintiff was a non-smoker (Tr. at 309). Plaintiff "admits for visual disturbances and some decreased auditory acuity." (Tr. at 309). The day after his admission, his blood pressure was 119/49 and his pulse was still abnormally low at 48, and a heart murmur was heard (Tr. at 309, 327). His blood sugar was still very high at 234 (Tr. at 309). Hemoglobin A1C was 11.23.[1] His EKG showed possible left atrial abnormality, poor R wave progression and persistent S wave suggesting pulmonary disease pattern (Tr. at 309-310). His second EKG showed left anterior superior hemiblock and poor R wave progression (Tr. at 310). Plaintiff's diabetes was noted to be uncontrolled, his hypertension was uncontrolled, and Wendell Williams, M.D., suspected that plaintiff's Atenolol (for hypertension) was contributing to his symptoms of dizziness and weakness (Tr. at 310).

On August 29, 2011, plaintiff saw Katherine Friedebach, M.D., (Tr. at 416-419, 529-532). Plaintiff reported that his blood sugar had been running as high as 277, and his blood pressure had been as high as 166/99. Plaintiff had been experiencing

---

[1] "The A1C test result reflects your average blood sugar level for the past two to three months. Specifically, the A1C test measures what percentage of your hemoglobin -- a protein in red blood cells that carries oxygen -- is coated with sugar (glycated). The higher your A1C level, the poorer your blood sugar control and the higher your risk of diabetes complications." Plaintiff's A1C measurement indicated an average blood sugar level of more than 270 -- 100 or lower is normal.
http://www.mayoclinic.org/tests-procedures/a1c-test/basics/definition/prc-20012585

intolerable diarrhea caused by Metformin, a side effect he had experienced in the past, and he was having depression associated with Citalopram, also a side effect he had experienced with that medication when it was prescribed in the past. His blood pressure at this appointment was 164/99. Plaintiff's hypertension was noted to be uncontrolled, his diabetes was "very uncontrolled." Plaintiff's medications were changed.

On October 12, 2011, plaintiff saw Katherine Friedebach, M.D., complaining of "a lot of difficulty with dizziness" (Tr. at 413-415, 526-527). Plaintiff had been taking all of his medication as prescribed, and he had been doing maneuvers to help with the dizziness, as previously directed, but with no improvement of his symptoms. Plaintiff's hypertension was noted to be improved but uncontrolled. His diabetes was uncontrolled. Dr. Friedebach was hesitant to change plaintiff's hypertension medication "secondary to his positional dizziness." She increased his diabetes medication.

On November 8, 2011, plaintiff was seen by an eye specialist (Tr. at 373). The diagnoses are illegible. On November 15, 2011, plaintiff returned to the eye specialist and discussed cataract extraction (Tr. at 374). Plaintiff saw the eye specialist on December 13, 2011; December 20, 2011; January 31, 2012; February 1, 2012; February 10, 2012; March 5, 2012; March 7, 2012; April 26, 2012; and June 5, 2012; but these records are illegible (Tr. at 374-382). A handwritten note dated July 10, 2012, states that office notes were faxed to Rehab Services for the Blind (Tr. at 381).

11

On November 30, 2011, plaintiff saw Katherine Friedebach, M.D. (Tr. at 410-412, 522-525). His hypertension was uncontrolled; his diabetes was improved but not controlled.

On January 25, 2012, plaintiff saw Katherine Friedebach, M.D., complaining of painful toes (Tr. at 406-407, 518-520). He had had this symptom for some time and thought it had gotten worse when he started taking blood pressure medication. Plaintiff's hypertension was noted to be uncontrolled despite his medication, and his diabetes remained uncontrolled as well. Tests were ordered.

On April 25, 2012, plaintiff saw Katherine Friedebach, M.D., for "chronic medical conditions" (Tr. at 401-404, 514-517). Plaintiff continued to report medication side effects. On exam, he had cervical spine tenderness. His A1C continued to be high indicating uncontrolled diabetes. His blood sugar was 164 on this day.

On May 22, 2012, plaintiff saw Crystal Sullivan, D.O., in Dr. Friedebach's office (Tr. at 397-400, 509-512). Plaintiff reported suffering from right ear pain for two years. Plaintiff reported in the past having been on a higher dose of Bystolic for his hypertension, but it caused him to have a low heart rate; he was on Hydrochlorothiazide and that caused him to have kidney issues. His blood sugar was high at 164. Dr. Sullivan told plaintiff to add Spironolactone to his current treatment regimen of Lisinopril, Bystolic and Caduet for hypertension.

On July 25, 2012, plaintiff saw Katherine Friedebach, M.D. (Tr. at 393-396, 506-509). Plaintiff reported feeling anxious and disconnected because of his vision

12

problems, and he could not get anything done. Plaintiff's blood pressure was 182/108. His blood glucose was high at 164. Blood work was ordered.

On August 15, 2012, plaintiff saw Katherine Friedebach, M.D., complaining of neck and shoulder pain (Tr. at 390-393, 502-506). "Patient states he has been having pain with his left shoulder and neck pain since he started coming here,[2] patient stated the focus has been on his blood pressure and his diabetes, patient states that his neck hurts all the time and is worse on the left side, . . . patient states that he has had increased pain in his neck for the past couple years, patient states it radiates into his left shoulder. . . ." His blood sugar remained high despite being complaint with medication. Dr. Friedebach prescribed Flexeril (muscle relaxer). His hypertension was noted to be uncontrolled.

On August 29, 2012, plaintiff saw Katherine Friedebach, M.D. (Tr. at 383-390, 471-474). Plaintiff reported that his Lisinopril causes him to feel like he is in a fog and that he has experienced that side effect "for quite some time." Plaintiff's blood sugar high at was 143. His Hemoglobin A1C was high at 6.2.

On September 24, 2012, plaintiff saw Katherine Friedebach, M.D. (Tr. at 499-502). Plaintiff complained of his hypertension medication making him feel like he is in a fog. "Patient states that he has noticed that side effect for quite some time."

On October 10, 2012, plaintiff saw Katherine Friedebach, M.D. (Tr. at 466-470, 494-498). Plaintiff continued to have a lot of trouble with his neck and shoulder.

---

[2]Plaintiff began seeing Dr. Friedebach six weeks after his last insured date.

"Patient states he has had this pain for the past couple years." Dr. Friedebach scheduled an EMG and x-rays.

On October 11, 2012, plaintiff was seen at University of Missouri Health System Ophthalmology Clinic by Dean Hainsworth, M.D. (Tr. at 541-543). Plaintiff had had "diabetes for 3-4 years. . . . He was seen by Dr. Weiss who noted diabetic retinopathy." On exam, significant cystic edema was present. He was assessed with background diabetic retinopathy, moderate; and clinically significant diabetic macular edema in both eyes, persistent despite previous grid photocoagulation. Dr. Hainsworth injected both eyes with Avastin[3] and recommended a total of 3 injections at monthly intervals to improve the macular thickening and visual function. Plaintiff had additional eye injections on November 14, 2012, and December 10, 2012 (Tr. at 544-546, 551-553).

On November 6, 2012, plaintiff was seen in the emergency room at St. Mary's Health Center, again listed as being self pay (Tr. at 442-449). He was having an echocardiogram and outpatient x-rays of the neck and left shoulder when he was brought to the emergency room due to blood pressure readings of 226/126 and 219/114.

On November 16, 2012, plaintiff saw Crystal Sullivan, D.O., for an emergency room follow up (Tr. at 460-464). He also stated that he has felt like his ear has been "stopped up for several years, states he is unable to see the ENT because of monetary concerns." He was assessed with eustachian tube dysfunction. His hypertension continued to be uncontrolled.

---

[3]Avastin slows vision loss by blocking the growth of abnormal blood vessels.

On November 19, 2012, plaintiff obtained treatment at the University of Missouri Health Care Dermatology Clinic for sores on his neck had back that had "been present for years. . . . Retired steel worker, lost all health insurance a few years ago." (Tr. at 548-550).

## V. FINDINGS OF THE ALJ

Administrative Law Judge Debra Denney entered her opinion on April 25, 2013 (Tr. at 12-16). Plaintiff's last insured date was June 30, 2010 (Tr. at 12, 14).

Step one. Plaintiff did not engage in substantial gainful activity from his alleged onset date of January 1, 2006, through his last insured date (Tr. at 14). Plaintiff worked during this period but his earnings did not result in substantial gainful activity (Tr. at 14).

Step two. There were no medical signs or laboratory findings to substantiate the existence of a medically determinable impairment (Tr. at 14-15). Therefore, plaintiff was not disabled from his alleged onset date through his date last insured (Tr. at 15).

## VI. MEDICAL SIGNS AND LABORATORY FINDINGS

An ALJ must explore the claimant's reasons for the lack of medical care before drawing a negative inference. S.S.R. 96-7p. An ALJ may need to "question the individual at the administrative proceeding in order to determine whether there are good reasons the individual does not seek medical treatment or does not pursue treatment in a consistent manner." S.S.R. 96-7p. The claimant's "good reasons" may include an inability to afford treatment, ineffectiveness of further treatment, or intolerable side effects. S.S.R. 96-7p. See Shauger v. Astrue, 675 F.3d 690, 696 (7th Cir. 2012) (inability to afford treatment is a "good reason" for failing to seek medical care); Alarid v.

Colvin, 590 Fed.Appx. 789 (10th Cir. 2014) ("[T]he adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide. . . . The individual may be unable to afford treatment and may not have access to free or low-cost medical services"). See also Whitman v. Colvin, 762 F.3d 701, 706 (8th Cir. 2014); Tome v. Schweiker, 724 F.2d 711, 713-714 (8th Cir. 1984).

In this case, although the ALJ was fully aware that plaintiff did not seek medical care because he had lost his health insurance when the company from which he retired went bankrupt, and he had applied for Medicaid but his already-reduced pension disqualified him, and he was not covered by Medicare, and he was having difficulty finding facilities that would enable him to get free or low-cost medical care, she not only failed to discuss how this may impact her analysis, she did not permit plaintiff's attorney to make any further record on the medical signs and laboratory findings and how those applied to plaintiff's condition prior to his last insured date.

Medical evidence of a claimant's condition subsequent to the expiration of the claimant's insured status is relevant evidence because it may bear upon the severity of the claimant's condition before the expiration of his insured status. Grebenick v. Chater, 121 F.3d 1193, 1199 (8th Cir. 1997); Martonik v. Heckler, 773 F.2d 236, 240 (8th Cir. 1985); Basinger v. Heckler, 725 F.2d 1166, 1169 (8th Cir. 1984).

The medical evidence summarized above supports plaintiff's testimony during the administrative hearing and clearly relates to the time period prior to his last insured

16

date. The ALJ did not find that plaintiff's testimony was not credible. The vocational expert testified that if a person were off task 20% of the time, that person would be unable to engage in substantial gainful activity. Because plaintiff's testimony supports the hypothetical to which the vocational expert testified a person could not work, and because the ALJ did not find plaintiff's testimony not credit, and because the medical signs and laboratory findings which post date plaintiff's last insured date are relevant to his condition prior to his last insured date, I find that the substantial evidence in the record as a whole does not support the ALJ's decision but supports a finding of disability.

## VII. CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole does not support the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is granted. It is further

ORDERED that the decision of the Commissioner is reversed. It is further

ORDERED that this case is remanded for an award of benefits.

/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
July 2, 2015